IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHNNY OWENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV43 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Johnny Owens brought this action to obtain review of a final decision of the Commissioner of Social Security[1] denying his claims for social security disability benefits and supplemental security income. The Court has before it the certified administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits and an application for supplemental security income, alleging a disability onset date of January 1, 2008. (Tr. 359-67.) The applications were denied initially and upon reconsideration. (*Id.* at 176-77, 200-201, 229-33, 237-254.) After a hearing, an Administrative Law Judge ("ALJ") determined on November 29, 2013 that Plaintiff was not disabled under the Act. (*Id.* at 202-218.) The Appeals Council

---

[1] Nancy Berryhill recently became the Acting Commissioner of Social Security and should be substituted as Defendant in this suit. *See* F.R.C.P. 25(d). Transcript citations refer to the administrative record filed manually with the Commissioner's answer. (Docket Entry 10.)

vacated the decision and remanded the case for further consideration. (*Id.* at 224-27.) There was a second hearing before an ALJ, and on June 2, 2016, the ALJ determined that Plaintiff was not disabled under the Act. (*Id.* at 18-39, 48-106.) The Appeals Council denied a request for review, making the ALJ's decision the final decision for purposes of review. (*Id.* at 1-4.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court is not whether Plaintiff is disabled but whether the finding that he is not disabled is supported by substantial evidence and based upon a correct application of the relevant law. *Id.*

## III. THE ALJ'S DECISION

The ALJ followed the well-established sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. §§ 404.1520 and 416.920. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The ALJ determined at step one that Plaintiff had engaged in substantial gainful activity from November of 2011 to July of 2012. (Tr. 20.) The ALJ therefore concluded that the remaining findings would address

2

the period that claimant did not engage in substantial gainful activity during the relevant period. (*Id.* at 22.) The ALJ next found the following severe impairments at step two: learning disorder, degenerative disc disease, right ear cholesteatoma, and degenerative joint disease of the right shoulder. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1. (*Id.* at 26.) The ALJ next set forth Plaintiff's Residual Functional Capacity ("RFC") and determined that he could perform medium work as follows:

> the claimant can occasionally lift and carry 50 pounds, and frequently lift and carry 25 pounds. He can sit, stand, and walk up to 6 hours each over an 8-hour workday. He can frequently use foot controls with his right lower extremity, with no limitations on his left lower extremity. He can frequently, but not continuously lift overhead and reach in all directions. He can frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but only occasionally climb ladders, ropes or scaffolds. The claimant is limited to hearing and understanding simple oral instructions and to communicating simple information. He can have occasional exposure to workplace hazards such as moving mechanical parts and unprotected heights. He can frequently operate a moving vehicle, can have frequent exposure to dust, odors, fumes, and pulmonary irritants, can have occasional exposure to extreme cold, extreme heat, vibrations, and loud noise. The claimant can perform simple, routine, and repetitive tasks, can make simple work-related decisions, and has no limitations in his ability to deal appropriately with supervisors or coworkers.

(*Id.* at 31.)

At step four, the ALJ determined that Plaintiff could perform his past relevant work as a warehouse worker. (*Id.* at 36.) In an alternative step five finding, the ALJ determined that

there were other jobs in the national economy that Plaintiff could perform. (*Id.* at 38.) Consequently, Plaintiff was found not to be disabled under the Act. (*Id.* at 39.)

## IV. ISSUES AND ANALYSIS

Plaintiff first objects that the ALJ "erred by failing to find that [his] mental and physical impairments meet[ ] the criteria of Listing 12.05C." (Docket Entry 14 at 6-15.) Second, Plaintiff contends that the ALJ erred in evaluating his ability to stay on task. (*Id.* at 16-18.) Neither objection has merit.

## V. ANALYSIS

### I. The ALJ's 12.05C Analysis Is Supported by Substantial Evidence.

Plaintiff first objects that the ALJ "erred by failing to find that [his] mental and physical impairments meet[ ] the criteria of Listing 12.05C." (*Id.* at 6-14.) That listing is described, and its applicable criteria are set forth, as follows:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

4

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[2]

Where, as here, the paragraph C severity criteria are at issue, the Fourth Circuit has described the first showing—deficits in adaptive functioning initially manifested during the developmental period—as "Prong 1." *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). The Prong 1 diagnostic criteria for an intellectual disability includes two components—deficits in adaptive functioning *and* an onset before age 22—that must both be satisfied in order for the Listing to apply. *Id.* at 475 (commenting that an ALJ's finding that neither component was satisfied would be upheld if "[e]ither finding alone" was supported by substantial evidence). The Fourth Circuit has also described the conjunctive paragraph C requirements—a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function—as "Prong 2" and "Prong 3." *Id.* at 473.

Here, in his decision, the ALJ evaluated this listing and concluded as follows "the 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a <u>valid</u> verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr. 30.) The ALJ also explained at considerable length why he concluded that Plaintiff did not

---

[2] The 12.05 Listing criteria were amended effective January 17, 2017, along with all of the other mental health listings. *See Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138–01, 2016 WL 5341732 (September 26, 2016). However, the Court applies the regulations in this decision as these were the regulations in effect at the time of the ALJ's decision. *Id.* n1. ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions. If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand.").

demonstrate deficits in adaptive functioning initially manifested during the developmental period. (*Id.* at 30-31.) For the following reasons, the undersigned concludes that substantial evidence supports the ALJ's conclusion that Plaintiff has not met all the criteria in Listing 12.05C.

### A. The ALJ's Prong One Analysis Is Supported by Substantial Evidence.

Plaintiff contends that he meets the first prong of Listing 12.05C, deficits in adaptive functioning initially manifested during the developmental period. (Docket Entry 14 at 6-12.) For the reasons set forth below, the undersigned concludes that the ALJ's Prong 1 analysis is supported by substantial evidence.

While Prong 1 of Listing 12.05C "does not expressly define 'deficits in adaptive functioning' . . . '[a]daptive activities' are described elsewhere in the [Mental Disorders] Listing . . . as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'" *Hawley v. Astrue*, No. 1:09CV246, 2012 WL 1268475, at *5 (M.D.N.C. Apr. 16, 2012) (unpublished) (citing *Blancas v. Astrue*, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05 and 12.00(C)(1)); *accord Hager v. Astrue*, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W.Va. Mar. 31, 2011) (unpublished).[3]

---

[3] Though Listing 12.05 does not specifically define "adaptive functioning," SSA regulations provide that "[t]he definition of [an intellectual disability] . . . in [the] listings is consistent with, if not identical to, the definitions of [intellectual disability] used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, at 20,022 (Apr. 24, 2002). Because "the SSA declined to adopt any one of [these] specific definitions .

Beyond this, in *Hancock v. Astrue*, the Fourth Circuit Court of Appeals provided a valuable standard of comparison for assessing an ALJ's findings regarding Prong 1's adaptive functioning requirement. In *Hancock*, the Fourth Circuit addressed for the first time whether an ALJ may reject an IQ score that is the only score in the record. 667 F.3d at 474. The claimant had been assigned a full scale IQ of 63 by the consultative examiner. *Id.* at 473. In his report, the examining psychologist did not attest to the validity of the scores or opine that the claimant gave her best effort. *Id.* The court reasoned that "[i]t is not at all clear whether an examiner's failure to attest to the validity of IQ scores *alone* would be sufficient to support an ALJ's decision to discredit the only IQ scores in the record." *Id.* at 475. Nevertheless, the court concluded that there was sufficient support for the ALJ to reject the sole IQ score on the record because it was inconsistent with the evidence in the record of the claimant's actual functioning and the conclusions of treating psychiatrists. *Id.* at 475.

*Hancock* is also particularly relevant to a Prong 1 analysis because the Fourth Circuit upheld the ALJ's finding that the claimant failed to carry the burden of showing deficits in adaptive functioning where the claimant had: (1) "the ability to shop, pay bills, and make change," (2) "takes care of three small grandchildren at a level of care that satisfies the Department of Social Services," (3) "does the majority of her household's chores, including cooking and baking," (4) "is attending school to obtain a GED," and (5) "does puzzles for

---

. . the introductory paragraph of Listing 12.05 can be met if the individual is found to have, inter alia, deficits in adaptive functioning as defined by any of the four professional organizations." *Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008).

entertainment." *Id.* at 476.[4]   Additional case law shows that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *See, e.g., Salmons v. Astrue*, No. 5:10CV195–RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012) (unpublished) (collecting cases).

Additional case law suggests that literacy is also an important factor. *See Luckey v. U.S. Dep't of Heath & Human Servs.*, 890 F.2d 666, 668-69 (4th Cir. 1989); *Salmons*, 2012 WL 1884485, at *7; *Holtsclaw v. Astrue*, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011) (unpublished); *Rivers v. Astrue*, No. 8:10-cv-314-RMG, 2011 WL 2581447, *4 (D.S.C. June 28, 2011) (unpublished).   Similarly, whether the claimant has lived independently is relevant. *Compare Salmons*, 2012 WL 1884485, at *7 *with Holtsclaw*, 2011 WL 6935499, at *5.

Another guiding factor is whether the claimant has ever provided care for others, or whether the claimant is dependent on others for care. *Compare Salmons*, 2012 WL 1884485, at *7 (noting claimant was heavily dependent on his mother and was not responsible for the care or supervision of others) and *Holtsclaw*, 2011 WL 6935499, at *4-5 (noting claimant had never lived independently and required a parent's help) *with Hancock*, 667 F.3d at 475-76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N.C. Oct. 18, 2011) (unpublished) (claimant assisted in the care of elderly parent).   School records and

---

[4] Although the Fourth Circuit found these characteristics sufficient to support a finding of an absence of deficits in adaptive functioning, the Fourth Circuit did not intimate that those (or comparable) capabilities constituted the minimum necessary to uphold such a determination. *See Hancock*, 667 F.3d at 476 & n. 3.

past academic performance are also important indicators of deficits in adaptive functioning prior to age 22. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."); *Rivers*, 2011 WL 2581447, at *3 (noting claimant classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); *see also Conyers v. Astrue*, No. 4:11-CV-00037-D, 2012 WL 3282329, at *8 (June 29, 2012) (unpublished), *adopted in* 2012 WL 3283285 (E.D.N.C. Aug. 10, 2012) (unpublished) (discussing the claimant's school history).[5]

Additionally, work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475–76 (concluding ALJ's finding that the claimant did not manifest requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, 2012 WL 529982, at *6 n. 3 (D.S.C. Jan. 30, 2012) (unpublished) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning and because the claimant in *Harts* did not otherwise meet the Listing 12.05C criterion of a valid IQ score within the range of 60-70), *adopted and incorporated in* 2012 WL 529980 (D.S.C. Feb.17, 2012) (unpublished).  Finally, the tasks a claimant is able

---

[5] Although *Conyers* was addressing Listing 12.05B, the adaptive functioning analysis in that case is instructive even when the issue is whether the Listing 12.05C criteria are met.

to undertake, although not determinative, have been considered in this analysis. *See generally Radford v. Astrue*, No. 5:08-CV-421-FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009) (unpublished) (finding that the claimant's ability to perform certain tasks was not inconsistent with a mild intellectual disability); *see, e.g., Hancock*, 667 F.3d at 476 & n. 3 (affirming ALJ's consideration of the claimant's ability to perform tasks such as shopping, paying bills, and making change); *Salmons*, 2012 WL 1884485, at *7 (discussing claimant's inability to do household chores, cook, and drive).

Here, the ALJ's determination that Plaintiff did not demonstrate deficits in adaptive functioning that were initially manifest during the developmental period is supported by substantial evidence. (Tr. 30-31.) More specifically, Plaintiff turned 22 in December 1997. (*Id.* at 154.) The school records and Plaintiff's work history are the primary evidence about Plaintiff before age 22. Plaintiff went to school through ninth grade.[6] He was retained in Kindergarten for a second year, promoted into first grade, afterwards had A's, B's, and C's in what were presumably special education classes, until he then dropped out in the ninth grade. (*Id.* at 30, 425-29, 478-80.) As the ALJ noted, the school records showed very low standardized test scores. (*Id.* at 30, 51, 478-81.) Nevertheless, Plaintiff's school records alone are not the only factor in determining deficits in adaptive functioning prior to age 22. Even assuming Plaintiff was exclusively enrolled in special education classes, such enrollment combined with passing grades and a failure to complete high school alone do not automatically compel a finding of deficits in adaptive functioning. *See, e.g., Henry v. Colvin*, No. 3:13CV357,

---

[6] Plaintiff thereafter worked as a brick mason for many years. (Tr. 31, 85, 561, 566, 823.)

2014 WL 856358, at *10 (E.D. Va. Mar. 4, 2014) (unpublished), *aff'd*, 585 F. App'x 135 (4th Cir. 2014) (unpublished).

Moreover, intellectual disability is "a lifelong condition." *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985). Because a person's intellectual disability usually remains constant, *see id.*, and there is no evidence that Plaintiff had a change in intellectual functioning, consideration of Plaintiff's adaptive functioning after age 22 is also relevant. The ALJ's Paragraph B analysis of Plaintiff's ability to maintain activities of daily living and social functioning supports the ALJ's finding that Plaintiff demonstrated intact adaptive functioning abilities. (Tr. 28-29.)

Specifically, substantial evidence supports the ALJ's finding that Plaintiff had only mild restrictions in the area of daily living. (*Id.* at 28.) In May 2009, Plaintiff told a consultative examiner, Dr. Gregory Villarosa, that he had no problems bathing, eating, or going to the grocery store. (*Id.* at 28, 561.) Dr. Villarosa observed that Plaintiff's appearance was neat and clean. (*Id.*) In July 2009, Plaintiff told a different consultative examiner, Dr. Jagjit Sandhu, that he took care of his three children. (Tr. 28, 567.) In October 2011, Plaintiff's wife indicated that he independently handled his personal care, prepared his own meals, did laundry, did dishes, went outside daily, and grocery shopped in stores. (*Id.* at 31, 439-41.) Plaintiff testified that he did not need help cleaning up or doing things around the house. (*Id.* at 149.) The ALJ also found that Plaintiff owns a home, does house repairs and car repairs, enjoys recreational activities such as 4-wheeling, drives, and can pay bills. (*Id.* at 31, 53, 57, 58, 59, 73-74, 441, 556, 561, 828.)

11

Additionally, substantial evidence supports the ALJ's finding that Plaintiff had only mild restrictions in the area of social functioning. (*Id.* at 28.) In May 2009, Plaintiff told Dr. Villarosa that he enjoyed playing with his children, got along well with others, and was making friends at church. (*Id.* at 28, 561.) In October 2011, Plaintiff's wife indicated that Plaintiff got along great with others. (*Id.* at 29, 443-44.) Although Plaintiff claimed he had no friends when he saw Dr. Villarosa in September 2015, Plaintiff admitted that he went to his mother's house three times a week, saw his uncle on occasion, enjoyed spending time with his children, and went to church on Sundays. (*Id.* at 28, 810.) At the March 2016 hearing, Plaintiff testified that he went to his mother's house two to three times a week, he had some friends, he was friendly with neighbors, and he spent time with family. (*Id.* at 57, 59, 71-74.) In addition, Dr. Arne Newman, a non-examining state agency physician, opined that Plaintiff had only mild limitations in this area (*id.* at 28, 159-60) and Dr. Villarosa opined that Plaintiff was only mildly limited in his ability to interact with others (*id.* at 31, 818).

Moreover, Dr. Newman opined that Plaintiff "is capable of carrying out short & simple instructions and has the ability to maintain attention & concentration for 2 hours at a time as required for the completion of simple tasks." (*Id.* at 28, 162.) Dr. Villarosa opined that Plaintiff was only mildly limited in his ability to understand, remember, and carry out simple instructions. (*Id.* at 817.) The Court concludes that the ALJ's finding that Plaintiff failed to demonstrate deficits in adaptive functioning prior to age 22 is supported by substantial evidence. *See, e.g., Caldwell*, 2011 WL 4945959, *3.

## B. The ALJ's Prong 2 Analysis Is Supported by Substantial Evidence.

The undersigned also concludes that the ALJ's Prong 2 analysis is supported by substantial evidence. As to this prong—"[a] valid verbal, performance, or full scale IQ of 60 through 70"—"[a]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. Subparagraph 6 (relating to intelligence tests) of paragraph D (addressing acceptable documentation) of § 12.00 (covering mental disorders generally) states:

> a. The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.

> b. Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A. . . .

> c. Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.

13

20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.00D.6.a, 12.00D.6.b, 12.00D.6.c.

Thus, to have a valid IQ score, a standardized intelligence test must be used and the results from the standardized test should be accompanied by a narrative report which assesses the validity of the test and comments upon whether it is consistent with the developmental history and the degree of functional limitation. *Id.* A standardized intelligence test is one that is generally accepted in the medical community as a scientifically valid test in terms of reliability and accuracy, such as the Wechsler series. *Id.*

Here, the record contains the results of two IQ tests administered by Dr. Villarosa in 2009 and 2015 and scored on the Wechsler Intelligence Scale. (Tr. 30, 562, 812-13.) The full scale IQ score in the former was a 66, and the full scale score in the latter was 61. (*Id.*) Dr. Villarosa supported his confidence in this testing by describing claimant's severe lack of activities of daily living, severe lack of social functioning, and his inability to maintain focus and concentration, as scored on the Vineland Adaptive Behavior Composite Score of 53, which put him in the 0.1 percentile. (*Id.* at 30, 810, 812-13.) Plaintiff also told Dr. Sandhu in 2009 that his IQ had been evaluated at between 70 and 80. (*Id.* at 30, 566.)

The ALJ specifically articulated a number of legitimate reasons for rejecting the 2009 and 2015 IQ scores. (Tr. 30-31.) First, the ALJ expressed concern that Dr. Villarosa's confidence in his testing was primarily based on Plaintiff's self-reported lack of functioning, which was not supported by the rest of the evidence of record. (*Id.* at 30.) Second, the ALJ noted that Plaintiff's wife contradicted Dr. Villarosa's note that Plaintiff was so limited that he relied on others for nearly all activities. (*Id.* at 31, 812-13.) As explained, Plaintiff's wife

indicated that he independently handled his personal care, prepared his own meals, washed clothes, did dishes, went out alone, grocery shopped, could pay bills, and got along with others. (*Id.* at 31, 439-44.) Plaintiff went to church on Sundays, drove, reported taking care of his three children, and worked on cars with his neighbor. (*Id.* at 31, 57, 71-72, 73-74, 149, 561, 567.) Plaintiff testified that he did not need help cleaning up or doing things around the house. (*Id.* at 149.)

Third, the ALJ also noted Plaintiff's social skills and regular work history. (*Id.* at 31, 32-33.) Although Plaintiff claimed he was fired from his masonry job because he could not read or do math, as the ALJ pointed out, Plaintiff told Dr. Villarosa that he was fired for taking his boss's car without permission. (*Id.* at 31, 135, 560.) Moreover, Dr. Villarosa wrote that one of Plaintiff's relative assets was arithmetic. (*Id.* at 31, 562.) Fourth, as explained below, despite having moderate limitations in concentration, persistence, and pace ("CPP"), the evidence supports the conclusion that Plaintiff can focus and sufficiently concentrate so as to perform simple tasks in the workplace. For these reasons, the ALJ sufficiently supported his conclusion that the 2009 and 2015 IQ scores on record were not valid.

### C. Plaintiff's Arguments to the Contrary Are Not Persuasive.

Plaintiff disagrees with the ALJ's analysis of this listing, but his arguments to the contrary are without merit. First, Plaintiff faults the ALJ for failing to consider the observations of a Social Security interviewer that Plaintiff stutters, speaks slowly, cannot read or write, gets his wife to help him, and that "[i]t appears from talking with him[,] that he does have some degree of mild [mental retardation]." (Docket Entry 14 at 9 referencing Tr 436.)

This argument is unpersuasive. An ALJ need not provide a written evaluation for each document in the record.[7] Additionally, the ALJ here repeatedly indicated in his decision that he considered the entire record (*see, e.g.,* Tr. 19-20, 31) and, absent a reason to believe otherwise, the Court is entitled to rely on these representations, *see Grubby v. Astrue,* No. 1:09CV364, 2010 WL 5553677, at *6 (W.D.N.C. Nov. 18, 2010) (unpublished) (citing *Rappaport v. Sullivan,* 942 F.2d 1320, 1323 (8th Cir. 1991)), *report and recommendation adopted,* No. 1:09CV364, 2011 WL 52865 (W.D.N.C. Jan. 7, 2011) (unpublished). Nor is this a case where an ALJ ignored a claimant's mental capacity. The ALJ here concluded that Plaintiff had a learning disability and limited his mental RFC finding accordingly. (Tr. 22, 31.)

It is also clear from the ALJ's decision that he was well aware of Plaintiff's difficulties with reading and writing and his allegations that his wife helped him. (Tr. 28, 31.) Likewise, as explained, the ALJ in this case held an evidentiary hearing at which Plaintiff testified extensively and, as a result, the ALJ had the opportunity to observe both Plaintiff's speech and his demeanor. (*Id.* at 48.) Consequently, even if there was some reason to conclude that the ALJ somehow missed this evidence (and there is not for the reasons provided above) there is no reason to believe that the observations of the Social Security interviewer would have had any material impact on the outcome of this case. *See Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case

---

[7] *See Brittain v. Sullivan,* No. 91–1132, 1992 WL 44817, *6 (4th Cir. March 11, 1992) (unpublished); *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir.1995); *see also N.L.R.B. v. Beverly Enterprises–Massachusetts,* 174 F.3d 13, 26 (1st Cir.1999); *Mellon v. Astrue,* No. 4:08–2110–MBS, 2009 WL 2777653, at *13 (D.S.C. Aug. 31 2009) (unpublished); *Brewer v. Astrue,* No. 7:07–CV–24–FL, 2008 WL 4682185, at *3 (E.D.N.C. Oct 21, 2008) (unpublished).

in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Second, Plaintiff contends that "[t]he ALJ wrongly states that Dr. Villarosa cited math as one of [Plaintiff's] strengths." (Docket Entry 14 at 10 referencing Tr 31.) Dr. Villarosa described "arithmetic" as one of Plaintiff's "[r]elative assets," but elsewhere noted that Plaintiff "did need to use his fingers for mathematical skills." (Tr. 562.) The ALJ characterized this as follows, "Dr. Villarosa also noted that the claimant could perform basic math calculations, noting it was one of his cognitive strengths." (*Id.* at 31.) If the ALJ here erred by characterizing one of Plaintiff's "relative assets" as a "cognitive strength[ ]," and this is far from clear, the error is at most harmless. This is because, as explained above, the ALJ provided a number of additional adequate reasons why Plaintiff failed to meet the first two prongs of a 12.05C analysis. *See Fisher*, 869 F.2d at 1057.

Third, Plaintiff faults the ALJ for discounting Dr. Villarosa's observations and test results. (Docket Entry 14 at 10-11.) In support, he cites *Rothrock v. Colvin*, No. 1:13CV497, 2016 WL 1175189, at *8 (M.D.N.C. Mar. 23, 2016) (unpublished), and argues that the activities of daily living cited by the ALJ here are not inconsistent with deficits in adaptive functioning. (Docket Entry 14 at 11.) Yet, the activities of daily living referenced in that case—watching television and movies at home and attending church regularly, *Rothrock*, 2016 WL 1175189, at *8 —are much narrower than the activities cited by the ALJ in this case, which are discussed above in greater detail. And, as further discussed above, the ALJ gave other good reasons for not finding Dr. Villarosa's test results valid and for not adopting his entire opinion.

17

Fourth, Plaintiff also contends that the ALJ's finding of moderate difficulties in the maintenance of CPP tends to negate the ALJ's finding that Plaintiff demonstrated a lack of deficits in adaptive functioning. (Docket Entry 14 at 11.) However, as explained below, the ALJ in this case adequately addressed the issue of CPP. There is no meaningful reason to believe that the ALJ failed to take it into account when performing his 12.05C analysis, weighing conflicting evidence, and concluding that Plaintiff had not met his burden as to this listing.

Fifth, Plaintiff next points to his school performance in special education classes, his low standardized test scores, and Dr. Villarosa's psychological evaluations. (Docket Entry 14 at 11-12.) He contends that this evidence demonstrates his deficits in adaptive functioning initially manifested during the developmental period. (*Id.*) Nevertheless, as demonstrated, the ALJ considered the entire record, weighed the conflicting evidence, and determined that Plaintiff had not satisfied the first prong of the analysis. This Court is not authorized to reweight the evidence. *Craig*, 76 F.3d at 589.

### D. Because the ALJ's Prong 1 and 2 Conclusions Are Supported by Substantial Evidence, Plaintiff Cannot Meet the Criteria of Listing 12.05.

Last, the only remaining Prong to consider is Prong 3. To qualify as a "significant work-related limitation" under Prong 3, the required physical or mental impairment "need not be disabling in and of itself." *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985). This requirement is therefore met when the ALJ has found that a claimant has other severe impairments. *Luckey*, 890 F.2d at 669; *Watson*, No. CBD–11–2491, 2013 WL 136425, at *8 (D.Md. Jan. 9, 2013) (unpublished); 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.00A (describing

18

"significantly limits" as, "i.e., is a 'severe' impairment(s)"). Here, at step two, the ALJ concluded that Plaintiff had the following severe impairments: learning disorder, degenerative disc disease, right ear cholesteatoma, and degenerative joint disease of the right shoulder. (Tr. 22.) Thus, if Prongs 1 and 2 are satisfied here, Plaintiff would necessarily satisfy Prong 3 of the 12.05C analysis. However, because the ALJ's Prong 1 and 2 conclusions are supported by substantial evidence, Plaintiff cannot meet the criteria of a 12.05 Listing. *Hancock*, 667 F.3d at 475 (concluding that Plaintiff "can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2"). In light of all of the above, and after carefully evaluating both the briefs of the parties and the entire record, the undersigned finds that substantial evidence supports a finding that Plaintiff did not carry his burden on this issue. *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) ("Through the fourth step, the burden of production and proof is on the claimant").

## II.     The ALJ's Mental RFC Finding Is Supported by Substantial Evidence.

Plaintiff next contends that the ALJ ran afoul of *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015). (Docket Entry 14 at 16-18.) In *Mascio*, the Fourth Circuit remanded the matter, in pertinent part, because the hypothetical the ALJ posed to the vocational expert, and the corresponding RFC assessment, did not include any mental limitations other than unskilled work, despite the fact that, at step three of the sequential evaluation, the ALJ determined that the claimant had moderate difficulties in maintaining CPP. *Mascio*, 780 F.3d at 637-38. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in CPP by restricting the hypothetical question to simple, routine tasks or unskilled work." *Id.* at

638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)) (internal quotation marks omitted). The Fourth Circuit emphasized the distinction between the ability to perform simple tasks and the ability to stay on task, stating that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* Although the ALJ's error might have been cured by an explanation as to why the claimant's moderate difficulties in CPP did not translate into a limitation in the claimant's RFC, absent such an explanation, remand was necessary. *Id.*

But here there is an adequate explanation. That is, unlike the ALJ in *Mascio*, who failed to provide a meaningful explanation reconciling a finding of moderate limitations in CPP with a mental RFC determination, *id.*, here the ALJ specifically considered Plaintiff's ability to maintain CPP. By way of example, the ALJ discussed the opinions of Drs. Newman and Villarosa, the third party report submitted by Plaintiff's wife, Plaintiff's allegations of difficulty concentrating, and his activities of daily living. (Tr. 29, 30, 32-33.) More specifically, first, in May 2009, Plaintiff demonstrated an adequate degree of sustained attention and concentration; his thought content was appropriate; and he was fully oriented, coherent, and logical. (*Id.* at 561.) Dr. Villarosa noted Plaintiff's "[r]relative assets" included visual attention to detail, auditory attention span, and arithmetic. (*Id.* at 562.) Dr. Villarosa opined that Plaintiff was capable of handling his own finances. (*Id.* at 563.)

Second, although Plaintiff's wife indicated that Plaintiff had a short attention span and trouble concentrating and focusing, she said that Plaintiff was capable of paying bills and counting change. (*Id.* at 441-43.) Third, Plaintiff was alert and oriented at his medical

20

appointments. (*Id.* at 598, 620, 623, 630, 637, 755, 824 ("denies . . . memory difficulties"), 836). Fourth, a non-examining state agency physician, Dr. Newman, opined that Plaintiff "is capable of carrying out short & simple instructions and has the ability to maintain attention & concentration for 2 hours at a time as required for the completion of simple tasks." (*Id.* at 28, 162.) *See, e.g., Sizemore v. Berryhill,* 878 F.3d 72, 81 (4th Cir. 2017) (concluding that opinions of non-examining state agency physicians may serve as substantial evidence that, despite moderate limitations in CPP, a claimant could stay on task); *Brown v. Colvin,* No. 1:15-CV-46, 2016 WL 1261211, at *3 (W.D.N.C. Mar. 31, 2016) (unpublished) ("Here, unlike in *Mascio,* the ALJ discussed substantial record evidence in determining Claimant's mental RFC, and his explicit reliance on the non-examining physicians' opinions adequately explains why Claimant's limitations in concentration, persistence, or pace did not translate into any additional restrictions in the ALJ's hypothetical to the VE.").[8] Fifth, as explained earlier, Petitioner also demonstrated a wide range of activities of daily living, which supports the ALJ's determination that Plaintiff is not limited in CPP beyond those restrictions incorporated in the mental RFC determination.

Last, this case is also factually distinct from *Mascio.* Unlike the mental RFC finding in *Mascio,* where the claimant was only restricted to simple, routine tasks or unskilled work,

---

[8] The ALJ in this case gave Dr. Newman's opinion "partial weight." (Tr. 28.) However, the ALJ went on to explain that this was only because he concluded that despite Dr. Newman's opinion that Plaintiff had no limitations in his activities of daily living, Plaintiff instead had "mild" limitations in that domain. (*Id.* at 28, 160.) Consequently, there is no reason to believe that the ALJ here had any intention other than adopting Dr. Newman's other conclusion that Plaintiff could sustain attention and concentration sufficiently to complete simple tasks.

*Mascio*, 780 F.3d 638, here Plaintiff was limited to hearing and understanding simple oral instructions and simple communication of information, and performing simple, routine, repetitive tasks that involve only simple work-related decisions. (Tr. 31.) For all these reasons, the Court concludes that the ALJ provided a sufficient explanation, supported by substantial evidence, in support of the mental RFC determination.

## VI. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) be **GRANTED** and the final decision of the Commissioner be upheld.

Joe L. Webster
United States Magistrate Judge

February 13, 2018